Statement of the Case.
MONROE, J.
In a litigation' between the corporations named in the caption which began in 1903, the sheriff of the parish of Acadia, acting under writs of sequestration, seized a 40-acre tract of “oil” land, and the oil which, from time to time, was produced therefrom, and the main questions now to to be determined are: (1) Do the charges for the piping and storage of the oil follow any of the judgments which have been rendered, as costs, or (2) are they to be regarded as expenses, incurred for the benefit of whom it might concern, which follow the oil? (3) Was the sheriff, acting under writs of judicial sequestration, authorized to burden the oil seized by him with charges, by contract or otherwise? (4) Are the charges reasonable? And there are some other questions of interest, which will be referred to hereafter. The present situation has been brought about as follows: Houssiere and Latreille were farmers, living in the parish of Acadia, who owned contiguous tracts of land upon which there were indications of oil, and, being brothers-in-law, they pooled their interests, and, in effect agreed to share their prospective fortune in common. In 1901 Latreille made an oil development contract with S. A. Spencer, with respect to 40 acres of his land, which contract was transferred, through S. A. Spencer & Co., to the Jennings-Heywood Oil Syndicate (hereafter called “Syndicate”). In May, 1903, Houssiere and Latreille transferred all of their land, including the 40 acres mentioned, to the Houssiere-Latreille Oil Co. (hereafter called “Houssiere Co.”), then organized, and Houssiere Co., proceeding upon the assump *976 tion that the contract with Syndicate was void, upon its face, in December, 1903, entered into a contract, for the exploiting of part of the same 40 acres with the Rayne Planters’ Oil & Development Oo. (hereafter called “Rayne Oo.”), and thereafter made similar contracts, with respect to other parts of said tract and of the entire body of land held by it, with the Texas Co. (hereafter called “Texas Co.”) and others, all such contracts being accompanied with an outside stipulation whereby I-Ioussiere Co. agreed to protect the other parties from loss to result from any pretensions of Syndicate. Syndicate began boring a well shortly after the contract with Rayne Co. was entered into, and Rayne Co. did likewise, about 15 days later. I-Ioussiere Co. then brought a possessory action (No. 1,881 of the docket of the district court), in which it obtained a preliminary injunction restraining Syndicate from trespassing upon the 40-acre tract, and it took an -appeal from an adverse judgment therein. Pending the appeal, the Producers’ Oil Co., transferee of Texas Co., “brought in” a “gusher,” yielding, perhaps, 4,000 barrels of oil a day, and Syndicate thereupon instituted a separate proceeding (No. 2,065 of the docket of the district court) alleging that I-Ioussiere Co. was appropriating and wasting the oil produced from the land in dispute, and praying that the court issue such order as equity and justice might require. And the court made an order directing the sheriff to sequester the oil, to sell it in the ordinary course of business, and to deposit the proceeds, and reserving to the parties in interest the right to apply for a modification of the order. Iloussiere Co., upon its application to that effect, was permitted to release the oil, or part of it, on bond, and later the judge set the sequestration aside, on the ground that he had been divested of jurisdiction by the appeal, and, upon the same ground, denied Syndicate an appeal from the judgment so rendered.
The ruling of the court denying the appeal was reversed by this court which, at the instance of Syndicate, issued a writ of mandamus ordering that the appeal be granted. And, when the ease was considered on its merits, it was held that the district court had jurisdiction to order the sequestration notwithstanding the pending appeal in the possessory action, since the necessity therefor had arisen after the appeal had been taken. Pending said appeal, however (in the suit No. 2,065), Syndicate instituted still another proceeding (No. 2,238 of the docket of the district court), in which it prayed for, and obtained, a further order to the sheriff to seize and sequester the oil produced by the wells described in the petition (being wells developed after the issuance of the previous writ), to sell the same in the ordinary course of business, and to deposit the proceeds, less the operating expenses, in bank, and, to that proceeding, Rayne Co., together with certain of its transferees, and P. Rouge, as well as I-Ioussiere Oo., were made parties. Thereafter, in January, 1905, this court handed down an opinion in the possessory action, holding that it was not well brought, and decreeing its dismissal, at the cost of the plaintiff (Iloussiere Co.); and, upon rehearing, that decree was affirmed in June, 1905.
Shortly thereafter, Iloussiere Co. moved that the sequestration ordered in the suit No. 2,0G5 be dissolved; the sheriff ruled Syndicate, as plaintiff in the writ, into court upon the subject of his costs; and the court dissolved the writ, and ordered Syndicate to pay the costs, from which judgment Syndicate appealed. Iloussiere Co. then made a similar motion with regard to the sequestration issued in the suit No. 2,238, whereupon Syndicate, alleging that the district *978 court was without jurisdiction in the premises, applied to this court for writs of mandamus and prohibition, which were denied. But on the appeal from the judgment dissolving the sequestration in the suit No. 2,-065 that judgment was reversed, and it was ordered that the writ be reinstated, and that Houssiere Co. pay the costs of its issuance and execution. And a similar decree was handed down on the appeal from the judgment dissolving the sequestration in the suit No. 2,238, which came up afterwards. The sequestrations as originally issued were therefore maintained, and were continued in force, until, say, October 21, 1906, when, by consent, two persons were appointed as “judicial sequestrators,” and the oil then on hand was turned over to, and thereafter administered by, them. In the meanwhile, Syndicate had instituted a suit, in the nature of a petitory action, for the determination of the question of title,. and though, save perhaps as to the matter of certain recognized costs, the judgment in the possessory action remained unexecuted, and Houssiere Co. remained in actual possession of the land in dispute, and continued, through its lessees, to develop oil thereon, the action so instituted was litigated to final judgment, which was given in favor of Houssiere Co.; the judgment (on rehearing) having been handed down on June 28, 1907.
The following facts, concerning the administration of the sheriff and some other matters, are agreed on (condensing, somewhat, the agreement, as we find it in the record), to wit:
(1) The Producers’ Oil Co. drilled the first well (known as “Producers’ Oil Co. Well, No. 1”; also, as-“Latreille Well No. 1”) on the property in dispute August 4, 1904.
(2) The entire output of that well was sequestered by the sheriff, who delivered 5,-147.55 barrels of it, for storage, to the Phcenix Pipe Line; then operated by the Sterling Oil Co.
(3) The sheriff then entered into “an arrangement” with the “Jennings Oil Co. and Heywood Brothers Pipe Line,” under which he delivered to that concern, for storage, 51,801.35 barrels of oil, all of which was sold and has been accounted for.
(4) The sheriff then discontinued the sale of oil, by order of court, and, thereafter, stored with Syndicate 84,813.69 barrels of oil.
(5) On September 26, 1904, the sheriff entered into a contract with Texas Co. for the storage of the entire output of the Latreille Well No. 1, up to 3,000 barrels a day; the' contract to run from its date until February 1, 1905. During that period, however, there were “brought in” Producers’ Oil Co. Well No. 4, Moonshine Well No. 1, Kneippe Water Cure Co. Well No. 2, and the Attakapas 'Syndicate Well No. 2; and Texas Co. handled the entire output, though only seven-eighths of the product (save that of Latreille Well No. 1) was sequestered and placed to the credit of the sheriff under the contract, the remaining one-eighth (not being sequestered) going to the credit of Houssiere Co.
(6) In April, 1905, the sheriff made a storage contract with Carnes Bass & Benkenstein, which was succeeded by Evangeline Oil Co., under which Evangeline Co. received all the sequestered oil (except as hereafter stated) produced between April, 1905, and October 21, 1906, at which latter date the property was delivered to the judicial sequestrators.
(7) In April, 1905, Rex Oil Co. Well No. 1 was “brought in,” and the output, to the amount of 95,188.48 barrels was stored in the earthen tank No. 3, of Crowley Oil & Mineral Co.; then 207,888.17 barrels were stored in tanks 3 and 4 of the Heywood Oil Co., after which Rex Co. and Houssiere Co., *980 jointly, obtained the release of 146,690.75 barrels at the well; and thereafter the product was stored with Evangeline Co., under its contract with the sheriff.
(8) After the judicial 'sequestrators took charge, on October 21, 1906, they stored the output of the wells with Evangeline Co., Jennings Oil Co., and Heywood Brothers Pipe Line, and Syndicate.
(9) Houssiere Co. was entitled, as royalty, to 30 per cent, of the product of Producers’ Oil Co. Wells Nos. 1 and 4, and to 40 per cent, of the product of Moonshine and Kneippe Water Cure wells, and it has received one-eighth of the product of those wells, save that of Producers’ Oil Co. Well No. 1, of which it has received nothing, save one-eighth that went into the line of Evangeline Co. up to June 1, 1906.
(10) The oil produced by Attakapas Oil Syndicate is to be regarded, for the purpose of this case, as having been produced by Houssiere Co.
It may be as well to say here that after the possessory action had been decided by this court,' the two proceedings in which the writs of sequestration were issued (the three bearing the numbers 1,881, 2,065, and 2,238 on the docket of the district court) were consolidated with it, and the litigation has, since then, for the most part, been carried on in the consolidated case. There were many moves and counter moves, motions, exceptions, etc., and, finally, for the purposes of the distribution of the fund and oil on hand and the determination of the questions of costs and charges and their proper distribution the judge a quo concluded that it would be better that the parties in interest should come together in concurso in order that the whole matter might be settled by one judgment. He, therefore, made an order that Jennings-Heywood Oil Syndicate, Houssiere-Latreille Oil Co., Texas Co., Producers’ Oil Co., Moonshine Co., Evangeline Oil Co., F. Rougé (representing Kneippe Water Cure Co.), Crowley Oil & Mineral Co., Rex Oil Co., Rayne Planters’ Oil & Development Co., J. M. Abbott Oil Co., Attakapas Oil Syndicate, J. L. Murrel, sheriff, and Alba Heywood and John M. Caffery, judicial sequestrators, be notified to show cause why such distribution should not be made. After hearing, there was a judgment (which covers some 20 typewritten pages of the transcript) from which the Texas, Houssiere, Evangeline, and Rex companies have appealed. Syndicate has answered, praying that the judgment be amended by recognizing it as owner of all the oil produced on the land in dispute after the setting aside of its lease, and particularly that which was sequestered. F. Bougé has answered complaining of the judgment, in so far as it (1) condemns him to pay certain storage and pipage charges to Texas Co.; (2) condemns him to pay $405.94 to Houssiere Co.-; (3) condemns him to pay Syndicate for storage; (4) perpetuates the injunction sued out by Evangeline Co.; (5) condemns him to pay Evangeline Co. for gathering and storing oil, and subjects his claim, against that company for oil stored, to deduction on account of seepage, leakage, and evaporation; (6) recognizes any lien on the proceeds of the oil sold; (7) condemns him to pay any costs; (8) condemns him to pay for storage to any of the sheriff’s keepers. The Crowley, Producers’, and Moonshine companies have answered, praying that, in so far as it affects them, the judgment appealed from be affirmed. Attakapas Syndicate is represented by Houssiere Co.; Kneippe Co. is represented by F. Rougé; and J. M. Abbott Co. has been, in some way, merged or eliminated.
Texas Co. presents its bill for storing and .piping oil received from the sheriff, which was produced from the wells drilled by the lessees of Houssiere Co. It also claims credit, as per its contract with the sheriff, for *982 oil lost, while stored in its tanks, by seepage, leakage, and evaporation. It also claims credit, under what is called the “fire clause” in its said contract. It complains that the judgment appealed from does not allow it enough for storage and pipage, and rejects its claim under said “fire clause.”
Evangeline Co. claims 40 per cent, of the oil produced from the Kneippe well, under a contract with Houssiere Co. and F. Rouge, whereby' it furnished the compressed air which produced the oil. It also makes a claim for the storage of certain of the oil so produced, and there are some incidental questions presented in that connection. It complains of the judgment appealed from only with respect to the storage charge.
Houssiere Co., as the lessor of the different companies by which (or by the sublessees of which) all the oil was produced, was entitled to a certain percentage of such oil, by way of royalty, which percentage was stored with the rest. It is, therefore, interested in the question of storage, on its own account, and, also, as the lessor and warrantor of its lessees, though the latter question is not here presented for consideration. It assumes about the same position as F. Rougé; i. e., that Syndicate, having been eventually cast in the litigation respecting the land in dispute, is bound for all costs and charges; that those costs and charges do not follow the oil; that they are unauthorized and exorbitant, etc.
Rex Co. as lessee under Houssiere Co., assumes a like position. The fund on deposit (being the proceeds of the sales of certain of the sequestered oil) amounts to something over $100,000. The parties interested agreed upon auditors, by whom statements were prepared which show the amounts which may be due upon the various claims, as one or the other of the different theories propounded may be adopted for the purposes of the judgment to be rendered, and the correctness of those statements does not seem to be disputed. We now go back to the period, in August, 1904, when the sheriff, acting under the writ of sequestration which had been directed to him, was confronted with the problem of seizing and sequestering the oil which had begun gushing at the rate of, say, 4,000 barrels, increased, as additional wells were brought in, to possibly 10,000 or more barrels per day. At that time, there were three pipe lines, all of limited storage capacity, doing business on the Jennings field, to wit: “Phoenix” (leased and operated by the Sterling Oil Co.), “Jennings Oil Co. & Heywood Brothers,” and “Crowley Oil & Mineral Co.” lines. The testimony of the sheriff in regard to the condition, prior to the date (September 26, 1904) when he contracted with Texas Co., is, in part, as follows:
“Q. What was the condition of the oil field in September, 1904, when you made this contract? I mean to say, W'hat was your ability, or facility, as sheriif, to handle the oil being produced in that field? A. None; absolutely none, except what I could get from other people, and the only available storage at that time was the storage with the Texas Co., with whom I made the contract. Q. What had you done with the product of the wells prior to September, 1904, the time of the making of the contract? A. I stored the oil in a good many places. I stored some with the Crowley Oil & Mineral Co. They let me have some storage, temporarily, and I believe the Sterling let me have some storage, for a small batch, and, probably, also the Syndicate; I don’t remember. I had about filled up every available place at that time. * * * Q. If you had not contracted for the storage of that oil, what would have become of the oil that would have been produced from the wells? A. Well, so far as I was concerned I would have had to let it run to waste; I had no means of storing it.”
W. W. Duson, then president of the Crowley Co., gives some testimony to which we shall fefer hereafter.
O. W. Heywood, who was prominently connected with the corporations bearing his name, says that in September, 1904, the tank-age accommodations in connection with the Jennings field consisted of one steel tank, of Crowley Co., capable of holding 37,500 barrels, one steel tank, belonging to his company, of about the same capacity, another, of *984 like size, belonging to Texas Co., and two (30,000 barrel tanks) belonging to Phcenix Pipe Line, and located at Mermentau. He further says that, within a few days or weeks after the first well came in, it was impossible to take care of the oil with the steel tankage; that it became necessary, continually, to build additional tanks, and that he thinks the statement a true one that, when the sheriff contracted with Texas Co., all the available storage at Jennings had been filled.
Considering the attitude of Houssiere Co. at that time, we find that, having bonded some of the oil first sequestered, it was ruled by Syndicate to show cause why it should not be required to increase the amount of its bond, and that, in answer to the rule, after setting up certain objections, predicated upon Syndicate's alleged lack of right to be in court, at all, it averred, in the alternative, that if the amount of the bond should be increased, and the larger bond should not be furnished by it, the sheriff should, in his handling of the oil, be governed by certain rules, which it suggested, as follows:
“(1) Due and proper care shall be exercised by him in the managment of the well, and others that may be drilled on the premises, to the end that therefrom shall be produced as much oil as possible, and, to this end, he shall designate an experienced person to manage and operate the same, whose appointment shall require the ratification of the court.
“(2) Sheriff shall make, with one or more pipe line companies or concerns, -the best possible pipage and storage arrangements available, agreeing to pay for such service not exceeding the usual rates, and such (arrangements) shall not cover any particular time or quantity and shall be as nearly equal (if more than one is employed) as may be.
“(3) Prom time to time, the sheriff shall be authorized to sell all, or any part, of the oil in his possession, but in such case, before making a sale, he shall give-days’ notice. * * *
“(4) At the close of each calendar month, the sheriff shall make a full and complete return to the court,” etc.
Somewhat later, Houssiere Co. moved the court “to order the sheriff * * * to hold the oil sequestered * * * until the final judgment, to be rendered by the Supreme Court,” alleging, as its reasons therefor, that it was unnecessary to make sales in order to pay expenses; “that the original orders of sequestration * * * did not authorize any sale of oil for any purpose whatsoever except that of preserving the oil from waste. At the period aforesaid, when the original order issued, there were not storage tanks sufficient to hold the oil produced on the land in litigation, * * * consequently the sheriff, in order to save the oil from waste, was bound to sell a certain portion thereof, until storage tanks were erected and constructed, adjacent to, and near,' the land, * * * from which the oil would be easily transported to said earthen tanks. Further, that the oil has remained in the storage tanks of the Texas Co. on the Jennings field, including both the oil on hand at the time of sequestration, or part thereof, and the oil which has been produced since that period; that said oil is entirely safe and secure from waste, and the only necessary charge being the charge for storage thereon”; that the question of the ownership of the oil would, probably, soon be determined; that, in consequence of the enormous production, the price of oil was so low that a sale would be ruinous to all parties, etc.
On September 15, 1904, “D. Caffery & Son,” on behalf of Houssiere Co., wrote to “Judge Jas. L. Autry,” general counsel, representing Texas Co., as follows:
“Dear Sir: In one of your letters to us you declined to entertain our request to store our proportion of oil arising from the royalty under your lease, at cost to you. This matter, on account of the lack of storage facilities, is one of acute interest. We -want, therefore, to renew the request that you store our royalty oil, together with your own, on the usual rates ot storage. We press the matter now for the reason that the market is glutted, the price falling constantly, and we have no means of storing our proportion of the oil coming from your well. We understand that your tanks are for storing oil for the public, as well as yourselves, and we *986 think we are entitled to a preference over the public, upon our paying the usual rates.
“Yours very truly,
“[Signed] D. Caffery & Sons.”
A favorable reply baying been received to the letter so written Mr. D. Caffery, Jr. (who was the general manager of Houssiere Co.), becoming concerned about the prospective expiration (on February 1st) of the contract with Texas Co. wrote again to Judge Autry, saying:
“The sheriff claims that the Texas Co. has notified him that it will not receive the Latreille oil after February 1st, and that will make it necessary for him either to sell the oil or to lay out $2,000 in building a piping station with which to deliver the oil to I-Ieywood. Heywood rang me up on the same subject and stated that he did not want to spend this money unless he could be assured that the plant would be allowed to remain in case we won the suit. -I told both Heywood and the sheriff that I could not give them any answer until I heard from you.”
Judge Autry testifies (and there is no attempt at, or suggestion of, contradiction) that he furnished the Messrs. Caffery, representing Houssiere Co., with a copy of the storage contract with Texas Co. and advised them of the extension of that contract. Being asked:
“Q. Now, Mr. Autry, did Caffery & Son, or Mr. D. Caffery, Jr., the general manager of this company (the Houssiere-Latreille Oil Co.), or Senator Caffery, president of this company, ever, at any time during the existence of this contract, or during its continuation, make any objection to any of its terms? A. I do not recall any objection made by either of those gentlemen, or any one connected, prior to the time we went into litigation, in June T907 — June 27, 1907; since then, we had. Q. As long as the litigation was pending, and this oil was under seizure, there was no objection made? A. I do not recall. on my part, any objection, to me. I do not find any letters to that effect in my correspondence with them, or any such entries.”
The sheriff testifies that all the parties interested in the oil knew of the contract with Texas Co. (and no one denies it); that they each were represented by a man at the storage tanks, who checked the deliveries; that the only parties who objected were Syndicate and Houssiere Oo. who “thought the contract charged too much. And I think (continued the witness) they were dissatisfied with some of the other provisions of the contract — such as the fire clause.” Being asked, “Did. they ever make any protest against the delivery of the oil under that contract, or was it outside talk, grumbling or such things?” he replied, “More in the nature of outside talk; they never made any formal objection” (and no one testifies to the contrary).
The contract with Texas Co. contains the following, among other, provisions:
“(1) That, for said oil, a regular division order shall be signed by the sheriff, upon the form and with the provisions in general used by the Texas Co., in Texas oil fields, with such variations only as this agreement shall fix.
“(2) From the net oil received from the settling tanks, there shall be deducted, for extraordinary loss in the use of earthen storage, 5 per cent, of the amount so received, and thereafter, on the first day of each month, an additional amount of 1 per cent, of the balance then shown to be in the lines to the credit of the account shall also be deducted.
“(3) The storage rate to be charged upon the oil shall be 33%$ per day, per 1,000 barrels, or at the rate of one per (?)'cent. per month [per barrel], such rates to be computed on the first day of each month following receipt, and on the first day of each succeeding month. * * *
“(5) For each barrel, deliverable, the Texas Co. shall be entitled to charge ten cents per barrel pipage, and be under obligation to load the same upon the tank cars at the Southern Pacific Railroad, at such station and through such pipe line as the Texas Co. may elect; the right thus to handle the oil being part of the consideration for the making of this contract.
“(6) The oil so received, and until delivered, shall be considered ‘common stock’ of the Texas Co., and shall be subject to the clause contained in the division order as to lightning and fire.
“(7) A printed copy of the division order shall be attached to this contract, the same being hereby referred to and made a part hereof.”
Tbe division order contains, inter alia, the following provisions:
“(1) It is 'understood that the delivery of the identical oil received is not required, but that oil of similar grade and quality is to be delivered. * * *
“(3) The Texas Co. shall not, in any event, be liable for loss of oil resulting from lightning, fire, storms or .other unavoidable causes, and such loss shall be deducted, pro rata, from all oil in the pipe lines and storage tanks of the *988 said Texas Go. at the time' of such loss. All accrued pipage and storage charges shall be paid on the amounts so deducted. In case the Texas Oo. has covered any of the oil so lost by insurance then the money collected on, said loss shall also be shared, pro rata, upon the payment of the pro rata part of the cost of the said insurance by the owner of the oil in said tanks or pipe lines.”
The evidence is conclusive to the effect that the allowance of 5 per cent, and 1 per cent, per month for loss by seepage, leakage, and evaporation, resulting from storage in earthen tanks, is reasonable, and, in most eases, insufficient to protect the bailee. It is also shown conclusively that the storage charge of 33% cents per day per 1,000 barrels is the customary charge all over the country, and has been, and is, now, the charge on the Jennings field. It is shown that the charge for pipage varies as the conditions vary. The Crowley Co., as we have seen, agreed to receive 37,500 barrels of oil, to be withdrawn within 30 days, on condition that it be paid 10 cents a barrel for the pipage. O. W. Heywood testified that he was unable to give the exact date upon which the charge for pipage fell below 10 cents a barrel. Being asked:
“It appears here in the sheriff’s account that, during the months of August, September, October, and November, 1904, he paid 10 cents pipage; to whom did he pay that?"
He replied:
“I don’t know to whom he paid it. I would say, in answer to your question, that we piped some oil for the sheriff, including piping, selling, and guaranteeing the bills; that is, it was placed in, and piped under, a pool, and we charged 10 cents for that service.”
Mr. Pew, manager of the Sun Co. and Sun Pipe Line, of Beaumont, testifies that he has been in the oil business since 1896, and that the company with which he is connected is largely engaged in piping and handling oil. Being asked:
“The sheriff also made a contract for a pipage charge of 10 cents per barrel, obligating the company to gather the oil at the lease (?), to put it in storage and pipe it and deliver it, including the loading of cars,'on the railroad, which was situated about four or five miles away. Was that a reasonable or an unreasonable charge covering these services? A. Ten cents a barrel? Q. Tes. A. It was a reasonable contract — the minimum contract to the best of my knowledge.”
It was admitted on behalf of Texas Co. that it had collected 3% cents a barrel, pip-age, on 80,000 barrels of the oil in question, which was received for account of the I-Cneippe Water Cure Co. well and delivered at Mermentau, and that the amount of that charge should be credited on the pipage charge, of 10 cents a barrel, here made.
It is shown that, in July, 1905, there were fires in the oil fields at Humble and Sour Lake, in Texas; that they were produced by lightning; that they destroyed some 2,238,-832.11 barrels of oil in the tanks or pipe lines of Texas Co.; that, on July 25th the company “wrote off” the loss on its books and charged a pro rata thereof to the oil held by it at Jennings; a proceeding to which the other parties to this litigation objected (when informed of it) and still object. The amount of the loss is, however, undisputed, as is, also, the amount of the pro rata charge, the objection going to the right of the company to make it. There were offered in evidence forms of contracts used by Sun Pipe Line, Guffy Co., National Transit Co., and Eureka Pipe Line, which contain clauses similar to that under consideration, and there is some oral testimony to the effect that Texas Co. expended several hundreds of thousands of dollars in building the earthen storage tanks, and providing the boilers, pumps and other appliances which were required, partly for its own purpose and partly for the purposes of its contract with the sheriff, and that the property in which that money was invested is, at this time, practically, worthless.
Houssiere Co. was entitled to a royalty from the oil produced from the Kneippe well, but the well failed to produce, and *990 Houssiere Oo. and F. Rougé (who appears to own or represent the Kneippe well) made a contract with Evangeline Co. whereby that company agreed to apply compressed air to the well, and, if necessary, to pump it, in, consideration of its being allowed 40 per cent, of the oil to be produced by either process. It executed its contract, and produced some hundreds of thousands of barrels of oil, some of which it stored in its own “lines,” and some of which was stored in the tanks of Texas Co. Texas Co., under its contract with Houssiere Co., was entitled to 70 per cent, of the oil to be produced as the result of its operations, and when its subcontractor brought in Producers’ Oil Co. Well No. 1, it being the first that was brought in on the Latreille tract, Texas Co., sooner or later, received a large proportion of the product on’ storage. In June, 1906, the district court made an order for the sale of all the oil which was held under the writs of sequestration, and Evangeline and Texas companies obtained injunctions for the protection of their respective interests, as stated above. The claims of Evangeline Co., under its contract with Houssiere Co. and F. Rougé, were sustained by the judgment of the district court, and we find no serious attack upon them in this court, though there appears to have been some contention in the district court to the effect that it should not have been permitted to deduct the 40 per cent, due it (of all the oil produced) from that portion of the oil which it held in storage; and some further contention to the effect that certain of the oil which appeared on its accounts as “B. S.” (being oil mixed with water which required treatment, and of which three barrels represented two barrels of merchantable oil) was not of that grade. We, however, agree with the judge a quo that those contentions were not well founded. Evangeline Co. complains that the judgment appealed from allows it only one-half of one cent (instead of one cent) per barrel per month for the storage of that proportion of the oil which belonged to Houssiere Co. and F. Rougé, allowing, in addition thereto, a “gathering” charge of 3 cents a barrel, and its counsel say, in their brief:
“The difference between this three cents per barre!, as a gathering charge, and the one-half cent per barrel per month that was denied, amounts to a very considerable sum of money, and, as to this, we feel that the judgment of the trial court should be reformed. * * * We claim that the proof is all one way on this subject.
“Indeed, we confidently assert that there is not one scintilla of evidence in this record impeaching the reasonableness of this charge of one cent per barrel per month.”
It has already been stated that one cent per barrel per month is shown by the evidence to have been, and to be, the usual charge on the Jennings field, and elsewhere.
Opinion.
I. The long litigation, of which this promises to be the closing incident, has consisted, in part at least, of proceedings more or less independent, some of which have been decided in favor of one of the parties and some in favor of the other, and in which, as a rule, in those particular matters which have been prosecuted to final judgments, the questions of costs have been irrevocably settled by such judgments. Houssiere Oo. brought a suit which put at issue, as between it and Syndicate, the fact of possession, and the right, predicated on such fact, to be maintained in possession of a certain tract of land. Properly speaking, no other issue belonged to the case, but, by consent of the parties, this court considered and passed on the question whether the title under which Syndicate claimed was void upon its face, and it was decided that Houssiere Co. had no such possession as would entitle it to a judgment and that the title exhibited by Syndicate was not void upon its face. And the suit was dismissed, at the cost of the *992 plaintiff, in both courts. A rehearing was granted, and, after a lapse of nearly six months, the judgment so rendered was reinstated and made the final judgment of the court. Houssiere, etc., v. Jennings, etc., 115 La. 107, 38 South. 932. That judgment' became final on June 22, 1905, and nothing has occurred since then, or, so far as we can see, can ever occur, to unfix the liability for costs which .was thereby fixed upon the plaintiff. Pending the appeal in the case thus cited, the district court, at the instance of Syndicate, in two several proceedings, issued writs of judicial sequestration in order to preserve the rights of the parties until there should be an adjudication thereof upon said appeal, and this court, upon two occasions, before making such adjudications, decided that the writs were properly issued and that the judge a quo erred in dissolving them. State v. De Baillon, 113 La. 572, 37 South. 481; Jennings, etc., v. Houssiere, etc., 114 La. 573, 38 South. 458.
Thereafter following the decision of this court in which the possessory action was dismissed at the cost of Houssiere Co., the judge a quo, concluding that the writ of sequestration (first issued) had discharged its function, again dissolved it, and the matter was again brought to the attention of this court, and it was again decided that the writ had been properly issued, and that it should be reinstated. In the course of the opinion it was said:
“After the final decision of the cause [referring to the possessory action] on appeal, the company [referring to Houssiere Co.] moved to set aside and dismiss the sequestration, on the grounds that the object of the writ being to hold the oil to respond to whatever final judgment might be rendered in the case, and as the judgment rendered did not affect the oil, the sequestration had become functus officio. * * * The motion to dissolve was sustained. * * * The question whether this judicial sequestration was rightfully issued was not before the Supreme Court [in, the possessory action], and therefore was not adjudicated. Nor do we think that the dissolution of the sequestration is a necessary legal result of the judgment rendered on appeal. We held that the action, was purely possessory and involved no question of title. * * * On the merits, we found, as a matter of fact, that the Syndicate was in possession, under its lease, * * * prior to any actual possession of the premises by the company or its lessees. The judgment dismissing the suit of the company and dissolving its injunction is conclusive that said company had no possessory rights and had wrongfully interfered with those of the Syndicate. The judgment left the Syndicate in possession of the tract in controversy, and, by necessary implication, affirmed its right, for the time being, to exploit the premises for oil and gas. The oil which was sequestered was produced by the lessees of the company, pending the appeal. The Syndicate’s right of possession attached to the oil, as a product of the soil. The sequestration should therefore be maintained at the cost of the party cast. Under the terms of the order of the court, the operating expenses should be deducted from the proceeds of the oil. AV'hat properly constitutes costs, in such a case, need not now be determined. It is, therefore, ordered * * * that the judgment appealed from be annulled, * * * and it is now ordered * * * that the writ of sequestration be reinstated, as having been properly sued out, and that the Houssiere Co. * * * pay all costs occasioned by the issuance and execution of the writ.” Jennings, etc., v. Houssiere, etc., 116 La. 1053, 41 South. 255.
Upon an appeal from a judgment dismissing the second writ of sequestration, it was said:
“The meaning of the judgments thus rendered by this court [referring to the judgments ordering the judge a quo to grant an appeal from his judgment dissolving the ojher writ and dismissing the possessory action] was, and is, that the company has no possessory rights in the 40-acre tract of land in dispute, or in any oil or gas which may be produced therefrom, which entitle it to interfere with the possession of the Syndicate, and that the sequestration had been properly issued as ancillary (or, to use the language of the Code of Practice, ‘to give effect’) to the principal suit, in, the sense that it was necessary for the protection of the defendant (Syndicate) and in order to prevent the plaintiff (company) from appropriating the oil whilst the rights of the parties were being litigated. Under the circumstances, the proposition that the silence of the decree in the principal (possessory) proceeding is to be construed as meaning that the sequestration was thereby dissolved, at the cost of the Syndicate, is wholly untenable, since, if the question, of sequestration had been presented by the transcript of appeal in that case, the writs would have been maintained. * * * It is said that: ‘As to the Houssiere-Latreille Oil Company, the only judgment which the pleadings allow is one granting, or overruling, the motion to dissolve.’ The answer to this is that the judgment provoked by *994 the company, and from which the Syndicate has appealed, orders that the sequestration be. set aside, and that the ‘plaintiff in sequestration, Jennings-Heywood Oil Syndicate, pay all the costs of the motion and the writ of judicial sequestration,’ and we are of opinion that, having reached the conclusion that the writs should be set aside, the judge a quo properly acted upon the question of costs, as we are equally of opinion that we should do so in holding that the writs were properly issued and should be maintained. * * * We repeat what has been said in the opinion last above cited (vide supra), that, ‘under the terms of the order of .court, the operating expenses should be deducted from the proceeds of the oil.’ What properly constitute costs, in such a case, need not now be determined.”
And the judgment appealed from was reversed, the writ of sequestration was ordered to be reinstated, and Houssiere Co. was condemned “to pay all the costs occasioned by the issuance and execution of said writ.” Jennings, etc., v. Houssiere, 117 La. 960, 42 South. 467.
It will thus be seen that the writs of sequestration were held to be ancillary to the possessory action, their function being merely to aid in protecting the right of possession and to give effect to any judgment which might have been rendered, in the pending suit, where that right, and that right alone, was at issue, and it will alsq be seen that the question of the liability of Houssiere Co. for the costs of the possessory action and “for all costs occasioned by the issuance and execution” of the writs of sequestration is a thing adjudged, and is not now open to review.
II. The question, what properly constitute costs, in a suit such as this, was intentionally left open for further consideration, save that it was held that the operating expenses should not be so considered. The oil was being produced in an alembic, or. furnace, conducted by nature, and was being projected, by natural forces, through the surface of the earth; man’s agency in the matter being confined to the providing of an outlet and storage accommodations, the one being as necessary as the other, and both being absolutely essential, whether provided by the sheriff or by the owners of the property, to the placing of the oil on the market as a commodity of commerce. The issuance of the writ created the necessity for action by the sheriff and his employés, and the judge a quo properly held that the charge for their services should be taxed as costs. But in the seeking and saving of petroleum, produced by the operations of nature, the necessity for the use of wells and storage tanks is inherent in the business, and, where a gushing oil well is sequestered, the expense of storing the oil must be regarded as an operating expense, which follows the oil and is not to be taxed as costs of the sequestration.
III. When Producers’ Oil Oo. Well No. 1 began gushing, and the sheriff was ordered to sequester the oil and hold it safely, he found himself in a position of considerable embarrassment and great responsibility, since a column of crude oil, propelled into the air with volcanic force, is not easy to seize, and no liquid is easy to hold safely unless one ‘is provided with, or is able to provide one’s self, with a receptacle for its accommodation. The sheriff had no such receptacle, and neither the court nor the law furnished, or directed him where’ to find, any, and the difficulty of his position is indicated by the testimony of Mr. Duson, who, as president of Crowley Co., controlled one of the few tanks which had, at that time, been constructed on the Jennings field. That witness says:
“Sheriff Murrel applied to me for storage for some oil on which he had seizure. He approached me several times on the subject, and I told [him that] I could not possibly let him store the oil in the steel tank, as we could not spare the room, and along one evening, after going to bed, Sheriff Murrel rang me up, and stated that he had orders to seize or sequester some oil, and that it was gushing wells, and the oil had either to go on the ground and be wasted or he would have to cut off the wells, unless he could get storage, and that the only chance was our tankage. After considerable talk, I informed him that the directors were opposed to storing oil, but. if he would let ua *996 pipe it, at the rate of 10 cents a barrel — simply to put it into our tank and to take it out, and not to extend over 30 days — we would let him have the tank, but he sure and not turn the oil over to us unless we would have the piping of it.”
With the understanding thus stated, the sheriff found temporary storage for 37,500 barrels of oil, and within a very short time thereafter he received a most urgent letter from Mr. Duson requesting him to comply with his agreement and take the oil away, the letter, dated Oct. 20, 1904, reading in part as follows:
“I beg to call your attention to the oil we have on hand for you in our large storage tank in the Jennings field, and to say that we are now compelled to use this storage tank for our purposes. No doubt that you will remember that on your several urgent applications to me to give you room to care for the oil and the urgent necessity of having to have the room immediately, that I could only agree that we could care for- the oil for a very short while, under no conditions, to exceed thirty ■ days, * * * Sincerely hope that you can allow us, in a short time, to commence unloading the tank as per our agreement. Let me hear from you at the earliest possible moment, and oblige.”
Prior to the date (September 26, 1904) when the contract with the Texas Co. had been entered into, Houssiere Co., through its counsel, had made the suggestion, by its pleading in court, that if the court should not dissolve the sequestration, or should increase the amount of the bond required for the release of the oil beyond what it was willing to give, the sheriff should be instructed to make an “arrangement,” with a pipe line, for storage. After the contract in question had been entered into, and Houssiere Co. had been furnished with a copy of it, it made a most pressing appeal to Texas Co. to store certain oil, belonging to it and which was not subject to the seizure. Still later, when the contract with Texas Co. was about to expire Houssiere Co. wrote again to Texas Co. indicating some solicitude upon the subject of its extension. And thereafter, during the whole period of nearly two years, whilst the contract with Texas Co. was being executed, to the knowledge of Houssiere Co., which, together with its lessees, time and again bonded oil out of the tanks of Texas Co., not a word of complaint was ever made by Houssiere Co. or any of its lessees to Texas Co. upon the subject of the latter’s contract with the sheriff. The parties mentioned did not hesitate to allow Texas Co. to expend thousands of dollars in the building of the tanks for the accommodation of their oil, to allow the sheriff, acting under an order, which, by its terms, was open to modification, to store the oil in those tanks, and to take it therefrom (on bond) for their own purposes, and they never intimated that they considered the “arrangement” by which all that was done to be unauthorized, or that the terms of the arrangement were unreasonable, until the time arrived for them to pay in accordance with those terms. We are therefore, inclined to the opinion, and, if the occasion required, might so hold, that they are not now entitled to be heard upon their complaints. But, waiving that question, we find that the sheriff had either to allow the oil which was pouring in on him to soak back into the earth from which it came, or else store it in the tanks, built and to be built by Texas Co.; for there was no other place to put it. It is evident, however, that he could not have put it in those tanks without the consent of the owner, and that, as the owner is not an eleemosynary institution, it was necessary to obtain such consent as the result of an “arrangement” for compensation, which, under the circumstances, might be called a contract. The sheriff, in other words, was obliged to choose between subjecting the owners to the absolute loss of the oil, or store it upon the conditions offered by the owner of the only available tanks, and he chose the latter alternative. If, in doing so, he acted as a prudent man would have done, when dealing with his own property, he was within the mandate conferred *998 on Mm by law. If tbe conditions imposed were unconscionable, and sucb as no prudent man would have accepted, Ms action was unauthorized, and Texas Co. would be entitled to recover only upon quantum meruit. The Code of Practice provides that:
“Art. 283. The sheriff, while he retains possession of sequestered property, is bound to take proper care of the same, and to administer the same, if it be of such a nature as to admit it, as a prudent father of a family administers his own affairs. He may confide them to the care of guardians or overseers, for whose acts he remains responsible, and he will be entitled to receive a just compensation for his services, to be determined by the court, to be paid to him out of the proceeds of the property, if judgment be given in favor of the plaintiff.”
The power to administer property carries with it, of necessity, the power to contract for the preservation of the property administered ; and, whilst a sheriff, being the executive arm of the court, should, ordinarily, obtain from the court special authorization for such purposes, nevertheless, as the law, itself, confers upon him, directly, the power of administration, and as the power of administration carries with it the power to contract, he may make contracts for the purposes of his administration, without such special authorization. Thus, by the terms of the law, he may confide the property “to the care of guardians or overseers,” which means that he may employ, make arrangements or contracts with, persons with reference to the care of the property and its handling, the only limitation being that his arrangements must be such as a prudent father of a family would make under like circumstances. In the case of Bank v. Childs, 49 La. Ann. 1359, 1364, 22 South. 384, 386, this court held that (quoting from the syllabus):
“A sheriff’s- tenure of property, under the writ of attachment, and its resulting duties and responsibilities, are differentiated by the law from his tenure of property under the writs of sequestration and fieri facias and his duties and responsibilities growing out of the same.”
And in the course of the opinion, it was said:
“This court has frequently held that where a sheriff’s possession of a plantation is of the character of judicial' sequestration, springing from its seizure under the writ of sequestration, or that of fieri facias or executory process, the obligation is upon him to administer, manage, and cultivate it, if this be necessary to the preservation of the property and its maintenance in good condition, and if he can obtain the funds or advances to so do.”
In the case of Owens v. Davis, 15 La. Ann. 22, it was held that the sheriff, who, in that case, held the property under attachment, was not authorized to insure it, but the court did not there, as in Bank v. Childs, distinguish between the powers of a sheriff acting under a writ of attachment and his powers when acting under the writs of fieri facias, seizure and sale, or sequestration, and there is no conflict between the two decisions.
We therefore conclude that the contracts entered into between the sheriff and Texas Co. and the sheriff and Evangeline Co. were authorized by law, provided that they were such as a prudent man, dealing with his own property, would have made. And we further conclude, after considering the contracts and the circumstances under which they were made, that a prudent man, dealing with his own property, would not, and could not, have done otherwise than did the sheriff.
IV. There can be no doubt that, where the volume of grain, stored in an elevator, or of oil stored in a tank, is made up of contributions from different owners, and becomes “common stock,” its partial destruction by fire, resulting from lightning or other fortuitous cause, must necessitate a pro rata distribution of the loss, and it may very well happen that a concern operating a number of elevators, whether in the same place or in different places, or storing or piping oil, whether in one place or in many places, may make common stock of all such commodity, *1000 in all of its elevators, pipe lines or tanks; and such an arrangement may be advantageous to all the parties interested. It is quite certain that if the 2,000,000 barrels of oil in which the litigants now before the court have been interested had all been stored, at one time, in the tanks of Texas Co., at Jennings, and had all been destroyed, it would have been to the advantage of the owners to have found that the loss was to be pro rated with a total of 5,000,000 barrels, of which 3,000,000 barrels, in Texas and Oklahoma, remained uninjured; for, in that ease, they would have received 1,200,000 barrels from the “common stock.” But we think that, unless it appears that a commodity, deposited by different owners, has been made common stock, as a matter of fact, a contract, purporting to make it so, should be expressed in unmistakable terms, particularly when, after a loss, it is sought to be enforced by the party by whom it was drawn, and we do not think that the contract between the sheriff and Texas Co. necessarily applies, so far as the fire clause is concerned, to any other than the Jennings field, upon which alone, as we infer from the evidence and surrounding circumstances, the oil of the litigants was mixed, or was intended to be mixed, with that of others. It is shown that Texas Co. had oil in different fields in Texas and Oklahoma, and it may also have had oil in Russia and Mexico; but the pipe line and tankage with reference to which the sheriff must be presumed to have contracted were at Jennings, and that it was understood that the oil deposited by him was not expected to be taken elsewhere is indicated by the fact that Texas Co. introduced testimony to the effect that the sheriff, with no objection from it, at times locked its tanks, in order that its deliveries might not impinge upon the volume of oil deposited by him; and, so far as we are informed by the evidence in the record, no oil from any other field was ever, as a matter of fact, mixed in the tanks at Jennings with the oil so deposited.
We therefore conclude that the judgment appealed from properly rejects the claim of Texas Co. for a pro rata contribution to its fire loss. We find that on July 25, 1905, Texas Co. made a charge upon its books, on account of the loss in question, against the different wells, the oil of which it had in storage, as follows (figures representing barrels) :
From Producers’ No. 1............. 92,256.00
“ “ No. 4............. 23,037.06
“ Moonshine No. 1............ 58,190.77
“ Kneippe Water Cure Well... 64,325.01
“ Attakapas Well............. 808.46
“ Jennings Air Plant......... 53,449.06
292,066.36
Houssiere Co. alleges in its pleadings that the oil so charged to the companies named was, on the date mentioned, converted by Texas Co. to its own use.- It is.now contended that Texas Co. should account for the oil as at a later date and at a higher price than prevailed at the date of the conversion. Texas Co., however, appears to have acted in good faith, and, as it believed that it was entitled to the oil in question, it may be assumed that it converted it to its own use at the time that it entered the charge upon its books. The general rule governing the measure of damages for tortious conversion is the value of the property converted, with interest. Arrowsmith v. Gordon, 3 La. Ann. 105; Chamberlain v. Worrel, 38 La. Ann. 347.
We are therefore of opinion that the judgment appealed from should be so amended as to require Texas Co. to account for the value of the oil charged against the several litigants (save those who have not appealed or prayed for an amendment of said judgment by answer to the appeal), on account of fire loss, at the rate of 25 cents per barrel, with legal interest on the amounts due said *1002 litigants, from July 25, 1905, until paid, after deducting its charges for storage and pipage and for loss by seepage, leakage, and evaporation up to said date. It may be remarked, in this connection, that whilst there are eases in which the highest market value of an article, between certain dates, may be a factor in the determination of the question of damages resulting from its nondelivery, we think the rule above stated should be applied here, because it is shown, that, if the oil in question had been delivered in compliance with the demand or order in June, 1906, it would have been sold, with the oil that was delivered at that time, for 34 cents a barrel, and, by reason of the additional charges and deductions with which it would by that time have been burdened, would have netted to the owners considerably less money than they will get by requiring Texas Co. to account for the oil as of date July 25, 1905, at 25 cents per barrel.
V. The claim which Syndicate asserts — to be decreed the owner of all the oil produced on the Latreille tract, up to the time that its lease was set aside — is humorous, but unsound. The fact that A. is decreed to be entitled to the possession of a tract of land until B. (with whom he is litigating the question of possession),, or some one else exhibits a title as owner, does not afford A. a sufficient basis upon which to claim the products of the land (which have gone into B.’s possession), after B., in a subsequent litigation, has obtained judgment against A. decreeing him (B.) to be the owner of the land.
VI. The sheriff stored something over 5,-000 barrels of oil with the Sterling Oil Co., for which he subsequently gave an order, which was not honored, the report being that the oil had been consumed in charges. The matter is, however, left in rather a hazy condition, and we think the judgment rejecting the demand against the sheriff with respect to that oil should be changed into one of nonsuit.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended (1) by allowing the Texas Co. (instead of as allowed by said judgment) storage and pipage (less 3% cents per barrel, on 80,000 barrels, which has been paid by F. Rougé), upon the basis agreed on in the contract, of September 26, 1904, with the sheriff; (2) by charging the Texas Co. (instead of as charged in said judgment)' with the value of the oil deducted by it on account of fire loss (save that charged to the accounts of those litigants who have not appealed or prayed for amendment of judgment by answer to the appeal) at the rate of 25 cents per barrel, with legal interest on the aggregate amounts due from July 25, 1905, until paid, after deducting its charges for storage and pipage and for loss by seepage, leakage, and exaporation, as per its said contract; (3) by allowing the Evangeline Oil Co. (instead of the gathering and storage charge as in said judgment) its storage charge at the rate of one cent per barrel per month for the amount of storage for which said judgment recognizes it as entitled to be paid; (4) by reversing so much of said judgment as rejects the demand of the Houssiere-Latreille Oil Co. against J. L. Murrel, sheriff, and, instead, dismissing said demand as in case of nonsuit.
It is further adjudged and decreed that, in all other respects, said judgment be affirmed; the costs of the appeal to be paid by the Houssiere-Latreille Oil Co., Producers’ Oil Co., Moonshine Co., Rayne Oil & Development Co., Francois Rougé, and J. L. Murrel, sheriff, in equal proportions.